# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

JOMARY GOMEZ ROSARIO,

                                   Plaintiff,

                       -vs-

CAROLYN W. COLVIN, *Acting Commissioner of Social Security*,

                                   Defendant.

**DECISION AND ORDER**

13-CV-6623 CJS

---

## APPEARANCES

| | |
|---|---|
| For the Plaintiff: | Mollie A. Dapolito, Esq. |
| | Martha Alice Roberts, Esq. |
| | 361 South Main Street |
| | Geneva, New York 14456 |
| | (315) 781-14456 |
| For the Defendant: | Sergei Aden, Esq. |
| | Social Security Administration |
| | Office of General Counsel |
| | 26 Federal Plaza |
| | Room 3904 |
| | New York, NY 10278 |
| | (212) 264-3650 |

## INTRODUCTION

**Siragusa, J**. This Social Security case is before the Court on cross-motions for judgment on the pleadings. For the reasons stated below, the Court grants Plaintiff's motion in part, reverses the Commissioner's decision, and remands for a new hearing pursuant to the fourth sentence of 42 U.S.C. § 405(g).

## BACKGROUND

With an assumed onset date of January 1, 2007, Plaintiff filed an application for Supplementary Security Income ("SSI") Benefits on July 16, 2010. This was denied on

November 4, 2010, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") on January 12, 2011. On July 17, 2012, Plaintiff appeared before and ALJ who ruled in a decision dated August 23, 2012, that Plaintiff has not been under a disability since July 16, 2010, the date her application was filed. R. 25–31.

Following the five-step sequential analysis set out in 20 C.F.R. § 416.920(a), the ALJ determined that Plaintiff was not engaging in substantial gainful activity and does in fact have the severe impairments of lumbar disc herniation and occasional blurred vision. At step three, he determined that Plaintiff's impairments did not meet or exceed the listings in Appendix 1, 20 C.F.R Part 404, Subpart P. R. 27. At step four, the ALJ determined that Plaintiff had the residual functional capacity ("RFI") to perform light work, except that she is only occasionally able to stoop, crouch, and crawl, must change her positions every forty-five minutes, and "is limited to performing work that does not require fine visual acuity." R. 27. Plaintiff did not have any past relevant work, thus leading the ALJ to progress to step five where the burden shifted to the Commissioner to show that Plaintiff was capable of performing work that exists in substantial numbers in the national economy. In that regard, the ALJ heard testimony from a vocational expert and concluded that Plaintiff could perform the jobs of café attendant and cleaner/housekeeper, both of which are unskilled, light exertion jobs with substantial positions available nationally.

In her memorandum of law in support of her motion for judgment on the pleadings, ECF No. 12-1, and her reply, ECF No. 16, to the Commissioner's memorandum, Plaintiff argues that the ALJ erred in evaluating Plaintiff's RFC and that his decision is not supported by substantial evidence.

*Medical Evidence*

On June 15, 2009, Plaintiff began a series of seven appointments under treating physician Eric Ramirez Diaz, M.D. at the Instituto Fisiátrico del Caribe at Ave. José Mercado, Puerto Rico. R. 326. Plaintiff was referred by Dr. Ramirez to Vallejo Ricard, M.D. for an MRI, which was completed June 23, 2009. R. 380. In that regard, the radiology report dated June 23, 2009, shows that "[a]t L5-S1, there is a broad based, somewhat extruded central disk herniation causing significant compression on the thecal sac[1] and mild compression on the neural foramina[2] bilaterally." R. 380.

Following the MRI, Plaintiff participated in six therapy sessions ending on July 16, 2009. R. 326. The initial treatment options included physical therapy and anti-inflammatory medication which proved unsuccessful. R. 369. A tertiary action of a L45S1 selective nerve root block was administered in February 2010 "with significant improvement of her pain." R. 369. In a final therapy progress note, Plaintiff's pain was reported as mild and Plaintiff's transfers and ambulation as independent in a progress note for physical therapy dated July 16, 2009. R. 335. Plaintiff continued selective nerve root blocks at the L45S1 paravertebral areas through the Las Americas Pain Interventional Center ("LAPIC") in Hato Rey, Puerto Rico, beginning care on August 8, 2009, under Aurea T. Negrón Valcárcel, M.D. R. 442. Plaintiff had four epidural steroid injection procedures: August 26, 2009, October 10, 2009, November 17, 2009, and February 23, 2010. R. 308,

---

[1] [T]he membranous sac of dura mater covering the spinal cord and cauda equina and containing cerebrospinal fluid. "thecal sac," *Merriam-Webster Medical Dictionary*, http://c.merriam-webster.com/medlineplus/thecal%20sac (last visited Feb. 3, 2017).

[2] [A] small opening, perforation, or orifice. "foramen," *Merriam-Webster Medical Dictionary*, http://c.merriam-webster.com/medlineplus/foramen (last visited Feb. 3, 2017).

310, 312, 314. Per Dr. Valcárcel's notes, Plaintiff found significant improvement of pain through the nerve block in February. R. 369.

Plaintiff testified before the ALJ that she came to the continental United States in 2010 from Puerto Rico seeking different doctors and the opportunity for a better life. R. 52. Plaintiff was seen on October 26, 2010, by Suzanne Picinich, D.O., a consultative doctor, for an internal medicine examination. Noted as a chief complaint in Dr. Picinich's report is low back pain beginning in 2006[3] and a herniated disc at the L5 level. Plaintiff also complained of more recent neck pain radiating to her left arm and mid forearm. In addition, noted in the report is a past diagnosis of diabetes mellitus type II, hypoglycemia and hypertension. R. 318–22. Dr. Picinich stated in her written report that Plaintiff has

> mild to moderate limitations for bending, lifting, and carrying, for standing and sitting for long periods without a change in position. Mild to moderate limitations for climbing stairs and inclines, as well for manipulating objects of anything more than lightweight above the level of her waist. She also has mild to moderate limitations for kneeling, squatting, stooping, and pushing, and pulling. She has moderate limitations for traveling.

R. 322.

On December 13, 2010, Plaintiff was seen at The Center for Pain Management by Dr. Calvin Chiang where Plaintiff rated her average pain on a scale of one to ten as a ten. R. 374. Dr. Chiang concluded that Plaintiff "does not have any frank neurologic symptoms that suggest an emergent evaluation by a neurosurgeon," and he recommended using transforaminal[4] injections and prescription tramadol and Flexeril. R. 372. On Feb-

---

[3] When asked by the ALJ, "when did you first start having problems with your back," Plaintiff responded, "2008, I believe." R. 54. In a Disability Report – Field Office – Form SSA-3367, Plaintiff's alleged onset date is listed as "01/01/2007." R. 213. This confusion remains unclarified.

[4] "[T]ransforaminal epidural injections have gained rapid and widespread acceptance for the treatment of lumbar and lower extremity pain." National Institutes of Health, US National Library

4

ruary 8, 2011, she received prescriptions for Tramadol and Flexeril, and on May 9, 2011, received an epidural injection. R. 384, 381.

Plaintiff testified she lost vision after the May injection, and was referred to Joseph D. Silverberg, M.D., an ophthalmologist. R. 59. On July 14, 2011, Plaintiff was diagnosed with central serous retinophy ("CSR") which was accredited to the recent steroid injection, according to resident Brook Miller M.D. R. 399. Transiforaminal injections were thereafter terminated as a form of treatment. R. 399.

Plaintiff began additional physical therapy on December 21, 2011, under Farley Wagner, P.T., M.D.T. R. 427. In the initial evaluation, Plaintiff was described with "clinical signs and symptoms of lumbar derangement," experienced "pain is never less than 5/10," and "Lumbar range of motion (ROM) is limited into flexion and extension at 40-50% loss in both directions." R. 427. Treatment concluded February 7, 2012. R. 441 Plaintiff was discharged from the program because of poor attendance, four cancellations and three no shows to appointments. R. 441. The status of the discharge observes that Plaintiff still complained of lumbar pain, continued difficulty with sleeping, and has "questionable compliance with follow through with strengthening." R. 441.

Ester S. Tanzman, M.D., in an appointment on April 16, 2012, reported that Plaintiff had a slow gait, was able to get on the exam table, had tenderness with slow leg raising, and pain in all directions. R. 472. Nevertheless, Plaintiff was still able to fully complete each action.

---

of Medicine, *Effectiveness of Therapeutic Lumbar Epidural Steroid Injections in Managing Lumbar Spinal Pain*, https://www.ncbi.nlm.nih.gov/pubmed/22622912 (last visited Feb. 3, 2017).

Plaintiff underwent an MRI imaging on May 4, 2012. R. 479–80. Nurse Practitioner Evelyn Stelmach completed a report of Plaintiff's visit to Dr. Tanzman's office on May 9, 2012. She wrote that the MRI revealed a "mild grade I retrolisthesis of L5 and S1 with moderate degenerative disc disease and mild bilateral neural foraminal narrowing," and that Plaintiff had a "small central disc protrusion at L5-S1 which abuts both S1 nerve roots within the central canal." R. 476. Ms. Stelmach recommended that Plaintiff continue with physical therapy and follow up with Dr. Tanzman. *Id.*

Plaintiff testified at the July 17, 2012, hearing before an ALJ in Rochester, New York. R. 43–70. She testified that she worked in Puerto Rico only at summer jobs while she was in high school. Accordingly, the ALJ determined that she had no past relevant work. R. 53. She stated that her most serious health problem was her back pain, followed by her eye. R. 53. She said her back pain started in 2008, that the pain was not from an accident, and that she suffered back spasms which gradually got worse over time. R. 54. She testified that her pain as she sat at the hearing was a "5" on a scale of 1 to 10, with 10 being the worst. *Id.* She said she takes Flexeril® and Mobic®, mostly at night, for pain, and tried to do the exercises her physical therapist asked her to do. R. 54–55. Four or five times a week she is in so much pain that the medications and exercise do not help. R. 56. She also stated she wears patches at night for the pain. Doing chores at home, and moving up and down the stairs of her three-floor home cause her pain. R. 56. Her oldest son carries the laundry basket for her because when she has carried it from the basement to the main floor it caused her a lot of pain. R. 57. She sweeps the floor "a little bit," and her children and she vacuum the carpets. R. 57. She stated she can drive, "but not for a long time." R. Her doctor has not suggested surgery yet. R. 58. In Puerto

6

Rico she received nerve blocks injections every month. When she came to the continental United States, she had an injection in May 2011, but discontinued them after that one injection caused her to become dizzy and her vision to become blurry. R. 58–59.

Plaintiff testified that she can pick up a gallon of milk if it is at table level, but not from the floor without it bothering her back. She said she would ask her children to move a 24-pack of soda from a table to the refrigerator instead of doing it herself. R. 59. Plaintiff testified that she could sit from 10 to no more than 30 minutes before needing to stand and that she could stand about 15 minutes before needing to sit, "but it's better to be standing up than sitting down," and lying down was best for her. R. 60. She also stated she could walk for about 15 minutes before needing to stop, "then I can start over again." R. 60.

The ALJ questioned Plaintiff about a notation that her back pain became worse in April 2012 when she lifted a child in a day care. Plaintiff explained that a friend of hers had come from Puerto Rico and Plaintiff was doing her a favor by helping out with her friend's children while they were at Plaintiff's house. R. 62. She was watching her friend's two children, ages one and a half and two, for the day and she had to pick them up. That was how she had hurt her back. R. 63.

In response to questions by her representative, Plaintiff stated she completed a form regarding her daily activities by using Google Translate. R. 63, 295–301. She said that other than the entry on that form stating she went shopping for two hours, it was accurate. She testified that she does not shop for two hours at a time. R. 22.

## JURISDICTION AND SCOPE OF REVIEW

Title 42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Additionally, the section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edision Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938). Section 405(g) limits the Court's scope of review to determining whether the Commissioner's findings were supported by substantial evidence. *See, Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding that the reviewing court does not try a benefits case *de novo*). The Court is also authorized to review the legal standards employed by the Commissioner in evaluating the plaintiff's claim. *Seil v. Colvin*, No. 15-CV-6275-CJS, 2016 U.S. Dist. LEXIS 34681 (W.D.N.Y. Mar. 17, 2016).

The Social Security Administration has designed a five step procedure for evaluating disability claims. 20 C.F.R. § 404.1520. That procedure is as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work

which the claimant could perform.

*Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir.1982) (per curiam).

## DISCUSSION

Plaintiff's first assignment of error concerns the ALJ's determination that she is able to perform work at the light exertional level, with the exception of the following limitations: she can occasionally stoop, crouch, and crawl; she must change positions every forty-five minutes; she is limited to performing work that does not require fine visual acuity. R. 27. Plaintiff argues that she is unable to perform work at any level on a sustained basis and that the ALJ's RFC determination is not supported by substantial evidence. She argues that the ALJ "ignored substantial evidence of record" and "improperly discounted medical opinions of record and [Plaintiff's] subjective symptoms…." Pl.'s Mem. of Law, Sep't 5, 2014, ECF No. 12-1.

### *English Language Abilty*

First, Plaintiff points out that her English is limited and that she needed an interpreter at the hearing. Further, the ALJ found "that she's Spanish speaking." R. 66. The ALJ's RFC determination did not comment on this non-exertional limitation. The Court notes that the Commissioner's regulation makes one's ability to speak and understand English an important factor for those claimants aged 45 to 49 years, but with regard to an individual under age 45, such as Plaintiff, the regulation states:

> It is usually not a significant factor in limiting such individuals' ability to make an adjustment to other work, including an adjustment to unskilled sedentary work, even when the individuals are unable to communicate in English or are illiterate in English.

20 C.F.R. § Pt. 404, Subpt. P, App. 2, sec. 200(h)(2). In another section of the Commis-

sioner's regulations, however, is this language:

> Since the ability to speak, read and understand English is generally learned or increased at school, we may consider this an educational factor. Because English is the dominant language of the country, it may be difficult for someone who doesn't speak and understand English to do a job, regardless of the amount of education the person may have in another language. Therefore, we consider a person's ability to communicate in English when we evaluate what work, if any, he or she can do. It generally doesn't matter what other language a person may be fluent in.

20 C.F.R. § 416.964(b)(6). In a case where the claimant argues that the ALJ erred by not considering his English language capability at step four of the sequential analysis, a district court in Kansas held:

> [T]he ability to speak English is not a factor the ALJ must consider at the fourth step, but is a factor that must be considered at the fifth step. *See Ordonez v. Massanari,* No. C00–4145–DEO, 2001 WL 34008720, *15, 2001 U.S. Dist. LEXIS 24634, at *42 (N.D.Iowa Sept.13, 2001) ("The ALJ only has to consider a claimant's limited ability to speak and understand English if the ALJ determines [at step four] that the claimant can not perform previous relevant work.").

*Chavez v. Barnhart*, 298 F. Supp. 2d 1207, 1216 (D. Kan. 2004). From the Court's review of the case law, and the Commissioner's regulation in 20 C.F.R., quoted above, it concludes that the ALJ was required to consider Plaintiff's English language capability at the fifth step of the sequential analysis.

The Commissioner argues that the ALJ did correctly assess Plaintiff's English language deficiency in his hypothetical questions to the vocational expert. While the vocational expert was on the stand, the ALJ informed him that Plaintiff was Spanish speaking. R. 66. Each of the hypothetical questions the ALJ addressed to the vocational expert asked him to assume "a hypothetical individual the same age, educational, work experi-

ence…" as Plaintiff. R. 66–69. Therefore, the ALJ committed no legal error in his assessment of Plaintiff's English language ability.

### *Plaintiff's Credibility*

Plaintiff contends that the ALJ failed to evaluate her credibility "with sufficient specificity to permit intelligible plenary review of the record." Pl.'s Mem. 11 (quoting *Williams o/b/o Williams v. Bowin*, 859 F.2d 255, 260–61 (2d Cir. 1988). The ALJ used an oft-criticized phrase, that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 28. This boilerplate language "implies that ability to work is determined first and is then used to determine the claimant's credibility." *Bjornson v. Astrue,* 671 F.3d 640, 645 (7th Cir. 2012). This language can be harmless "[i]f the ALJ has otherwise explained his conclusion adequately," *Filus v. Astrue,* 693 F.3d 863, 868 (7th Cir. 2012). Here the ALJ did explain the basis for his credibility determination in detail:

> [T]he claimant has described daily activities that are not limited to the extent one would expect given the complaints of disabling symptoms and limitations. Although the claimant needs assistance, she is able to cook, clean and do laundry. She is able to sweep the floor and drive a car. The claimant has no restrictions on driving. She is able to go to the grocery store. The claimant takes care of her children, and she was able to babysit her friend's children, who are both under age three (Testimony). Caring for young children is very demanding. Although the claimant indicated that she exacerbated her back injury lifting the children, she nevertheless was able to care for them. The claimant has received various forms of treatment for the allegedly disabling symptoms, which would normally weigh in the claimant's favor. The record reveals, however, that the treatment has been generally successful in controlling those symptoms. The claimant has received nerve root blocks, which has [sic] proven to reduce her pain (Ex. 9F).

R. 29.

Plaintiff maintains that the ALJ failed to take into consideration the considerable assistance she receives from her children in performing most activities of daily living. Pl.'s Reply Mem. 6. Plaintiff urges the Court to find, as did the court in *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010), that the ALJ's decision was "based on so serious a misunderstanding of [Plaintiff's] statements that it cannot be deemed to have complied with the requirement that they be taken into account."

The Court agrees that the ALJ's decision did not sufficiently take into account Plaintiff's children's contributions to her ability to function at home. His reference to her ability to care for the young children of her friend implies that she is able to lift young children without a problem, whereas Plaintiff's testimony related to one instance of caring for her friend's children, and no further care after that because lifting the child hurt her back. R. 62–63. Further, his reference to the nerve blocks is inaccurate. After receiving only one nerve block shot in the continental United States, she discontinued nerve blocks out of fear for losing her vision completely. R. 399. Therefore, the ALJ's statement implying that her pain was now controlled is not supported, but rather contradicted by substantial evidence. Even the physical therapy notes indicate a problem with sleeping due to pain, which the ALJ did not address in his assessment of her testimony. Therefore, the Court concludes that the ALJ's credibility assessment does not comply with the Commissioner's regulations to take into account all available evidence.

***The Medical Evidence***

Turning to the medical evidence, Plaintiff argues that she "has proven that her physical impairments cause significant limitations in her ability to perform the exertional

and nonexertional demands of work." Pl.'s Mem. 8. The ALJ relied on the consultative examiner's opinion that Plaintiff's limitations "fall into the mild to moderate range" and that her treating physicians never indicated that her impairments were disabling. R. 29.

In her reply memorandum, Plaintiff argued that the Record contains evidence of restrictions greater than those identified by the ALJ. Pl.'s Reply Mem. of Law 4. She points out that physical therapist Farley Wagner stated on February 9, 2012, that Plaintiff was "limited with lifting and waist to floor motion with 15 pounds." R. 431. Further, she points to Dr. Aurea T. Negron Valcarcel, M.D.'s statement that Plaintiff was limited by her diagnosis of L5/S1 disc herniation "from standing or walking for long periods, she can neither go up or down stairways…." R. 442. Dr. Tanzman wrote in April 2012 that she should "avoid heavy lifting and bending." R. 473. Plaintiff also relates her testimony and complaints to medical personnel about her inability to sleep due to pain. Pl.'s Reply 4–5.

In his assessment, the ALJ wrote that Plaintiff had the RFI to perform light work, except that she is only occasionally able to stoop, crouch, and crawl, must change her positions every forty-five minutes, and "is limited to performing work that does not require fine visual acuity." R. 27. The Commissioner defines light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 CFR § 416.967(b). Plaintiff's physical therapist Farley Wagner wrote that Plaintiff was

13

limited to lifting 15 pounds from floor level, and her medical doctor stated she should avoid heavy lifting or bending. The ALJ's determination that she could lift 20 pounds is not supported by substantial evidence in the Record. Further, the ALJ's RFC determination did not address Dr. Valcarcel's statement that Plaintiff was limited from standing or walking for long periods. Plaintiff's own testimony described how going up and down stairs exacerbated her pain. R. 56. She also testified that she could not walk long distances without taking time to rest. R. 60.

The ALJ's hypotheticals to the vocational expert described an individual who was Spanish speaking, had no past relevant work, had a 12th grade education, and was born in 1982, so was a younger individual. R. 66. Further, he asked the vocational expert to assume that individual could perform light work with the following limitations: occasional stooping, crouching and crawling. R. 66. The vocational expert identified cafeteria attendant, and cleaner housekeeper jobs that hypothetical person could perform, neither of which required visual acuity either. R. 67–68. Adding that the individual would have to change positions every 45 minutes did not change the vocational expert's response. R. 67. When the ALJ added that the individual could only perform sedentary jobs, the vocational expert said there would be no jobs, primarily because of the language barrier and lack of visual acuity. R. 68. If vision were not an issue, the hypothetical individual could perform the sedentary jobs of general assembler, and table worker. Finally, if the hypothetical individual would be off task 20 percent of the time, then no jobs would be available. R. 69.

The Court finds that the ALJ's RFC determination is not supported by substantial evidence in the Record. Because the vocational expert's responses indicating that jobs

were available required a determination that Plaintiff had an RFC for light work, as well as a facility with English and good visual acuity, the Commissioner's determination that there are jobs in the national economy that Plaintiff could perform is not supported by substantial evidence.

## CONCLUSION

For all the foregoing reasons, the Court denies the Commissioner's motion for judgment on the pleadings, ECF No. 15, and grants Plaintiff's motion, ECF No. 12. This matter is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g).

DATED:    February 17, 2017
          Rochester, New York

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge